## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Liufang Hua,

    *Plaintiff,*

v.

Arthur J. Gallagher & Co.,

    *Defendant.*

No. 20 C 6921

Judge Lindsay C. Jenkins

### MEMORANDUM OPINION AND ORDER

In a suit against her former employer, Plaintiff Liufang Hua alleges discrimination, retaliation, and failure to accommodate under the Americans with Disabilities Act ("ADA") against Defendant Arthur J. Gallagher & Co. ("Gallagher"). [Dkt. No. 1.] Before the Court is Gallagher's summary judgment motion. [Dkt. No. 31.] For the reasons stated below, the motion is granted.

## I.  Factual Background[1]

### A.  Hua's Job at Gallagher

From approximately June 2016 until June 15, 2020, Hua worked in the Rolling Meadows branch of Gallagher. [Dkt. No. 38-6 at ¶¶ 1–2, 65.] Gallagher is an "insurance brokerage and risk management services company that offers a wide range of products and services in the fields of property/casualty insurance, employee benefits and consulting, and claims management to clients around the world." [*Id.* at

---

[1] The following facts are undisputed, unless otherwise noted. The Court views the facts in the light most favorable to the non-moving party—Hua. *See Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir. 2002).

¶ 1.] Hua worked as an Accounts Payable Specialist in the Accounts Payable Department. [*Id.* at ¶¶ 2, 16.]

The Accounts Payable Department had various roles, including manager, supervisor, team leads, senior Account Payable Specialist, and Accounts Payable Specialist, like Hua. [*Id.* at ¶ 16.] Accounts Payable Specialists worked on a mix of day-to-day transactional work, leadership and training responsibilities, and special projects. [*Id.* at ¶¶ 17–18.] On a monthly basis, managers assigned Accounts Payable Specialists transactional work through a Cash Payment/Accounts Payable ("CP/AP") report, which contained "open items/variances" in the general ledger that were unresolved and needed to be reconciled [*Id.* at ¶¶ 3–4, 17–18.] Additionally, managers would assign Accounts Payable Specialists to certain insurance carriers to ensure that any "variances" or transactions that arose with that carrier would be monitored by that employee. [*Id.* at ¶¶ 21–22; Dkt. No. 32-2 at 63.] Accounts Payable Specialists were not penalized or disciplined for failing to resolve pending variances. [Dkt. No. 38-6 at ¶ 22.]

The parties dispute what constitutes "day-to-day transactional work," the amount of time that each Accounts Payable Specialist would spend on that work versus time spent on other things such as special projects, training or leadership responsibilities, and the importance of the CP/AP Report. Gallagher contends that "day-to-day transactional work" and resolving variances are one in the same and that Hua performed almost exclusively this sort of work. [Dkt. No. 39-1 at ¶ 7.] Gallagher argues that each Accounts Payable Specialists had a differing workload, with "[s]ome

Accounts Payable Specialists focused on day-to-day transactional work [like resolving variances], while others engaged in special projects or had training or leadership responsibilities in addition to any transactional work assigned to them." [Dkt. No. 38-6 at ¶ 17; Dkt. No. 39-1 at ¶¶ 7, 10.] Because the amount of time spent resolving variances was dependent on the individual, Gallagher maintains that the CP/AP Report, as a log of unresolved variances, is not a good indicator of workload. [Dkt. No. 38-6 at ¶¶ 20–21.]

Hua maintains that resolving variances and "day-to-day transactional work" were separate and that variances arose from issues from "day-to-day transactional work." [Dkt. No. 39-1 at ¶ 6.] Based on her "observations and experiences," every Accounts Payable Specialist, including Hua, spent 50–70% of their total workload resolving variances reflected in the CP/AP Report. [Dkt. No. 38-6 at ¶ 17.] The remaining portion of an Accounts Payable Specialist's workload was "day-to-day-transactional work and special projects." [*Id.*] Because most of an Accounts Payable Specialist's workload was resolving variances, Hua argues that the CP/AP Report is a good indicator of workload. [*Id.* at ¶ 20.]

When Hua started at Gallagher in approximately June of 2016, Maria Salazar was her supervisor. [*Id.* at ¶ 5.] Salazar, in turn, reported to Yolanda Thomas, who served as a manager. [*Id.*] In July or August of 2019, Thomas left. [*Id.* at ¶ 7.] As a result, Maryam Morgan, who worked as the Accounts Payable Department Supervisor, temporarily became Hua's supervisor. [*Id.* at ¶ 9.] In October of 2019,

Laura Neuman became National Accounts Payable Manager and oversaw Hua's work as her manager.[2] [*Id.* at ¶ 10.]

### B.    Hua's Medical Issues

In approximately May of 2018, Hua was diagnosed with hypertrophic cardiomyopathy ("HCM") and atrial fibrillation ("A-FIB").[3] [Dkt. No. 39-1 at ¶¶ 1, 14.] Her condition caused her to be admitted to the hospital twice, once in May 2018 and again in July of 2018. [*Id.* at ¶¶ 1–2, 15–16.] Hua requested permission to work from home after both incidents, sending her requests to Morgan and Thomas. [*Id.* at ¶¶ 15–16.] Both requests were denied. [*Id.*]

### C.    Events Preceding Gallagher's June 2020 Reduction in Force

In late 2019, two Accounts Payable Department members resigned. [Dkt. No. 38-6 at ¶¶ 15, 25.] As a result of their departure, their work needed to be reassigned to other members of the Accounts Payable team. [*Id.* at ¶ 25.] Gallagher reassigned this work in two rounds, the first in December of 2019 and the second on January 15, 2020. [*Id.* at ¶¶ 26–28.] Hua received a portion of this work both times. [*Id.*] Based on the CP/AP Report from December 2019 to April 2020, Hua argues that she received

---

[2]    Hua contends that Neuman did not start her job duties until December of 2019 [Dkt. No. 38-6 at ¶ 46], which Gallagher disputes [Dkt. No. 39-1 at ¶ 22.] Regardless, Hua agrees that Neuman was assigned as her manager in October of 2019 [Dkt. No. 38-6 at ¶ 47].

[3]    Hypertrophic cardiomyopathy, or "HCM," is "a disease in which the heart muscle becomes thickened." [Dkt. No. 39-1 at ¶¶ 1–3]; *Hypertrophic cardiomyopathy*, Mayo Clinic (last visited May 15, 2023), https://www.mayoclinic.org/diseases-conditions/hypertrophic-cardiomyopathy/symptoms-causes/syc-20350198. Atrial fibrillation, or "A-Fib," which is "an irregular and often very rapid heart rhythm (arrhythmia) that can lead to blood clots in the heart." [Dkt. No. 39-1 at ¶¶ 1–3]; *Atrial fibrillation*, Mayo Clinic (last visited May 15, 2023), https://www.mayoclinic.org/diseases-conditions/atrial-fibrillation/symptoms-causes/syc-20350624#:~:text=Atrial%20fibrillation%20(A%2Dfib), and%20other%20heart%2Drelated%20complications.

a disproportionately large share of this work and had a substantially increased total workload as a result. [Dkt. No. 39-1 at ¶ 17.]

After the second round of work was redistributed to Hua in January of 2020, Erica Wright, a Senior Accounts Payable Specialist, emailed Hua, stating that if she was "stuck" on any of the newly assigned variances, Hua could set up a meeting with Wright. [Dkt. No. 38-6 at ¶ 29.] Hua requested such a meeting to discuss her "overload situation." [*Id.* at ¶¶ 29–31.] Wright conveyed that she could not reassign the work to another employee, only Neuman, as Hua's manager, could. [*Id.* at ¶¶ 29–31.]

On January 16, 2020, Neuman emailed Nicole Florer, a Human Resources employee at Gallagher, about Hua. [Dkt. No. 38-4 at 10–12.] Neuman conveyed that she knew that Hua had a pending "intermittent FMLA" leave claim but she could not "find[] anything in the HR files left for [her]" and accordingly did not know Hua's restrictions. [*Id.* at 10–12.] Florer confirmed that Hua had no restrictions. [*Id.* at 12.] The email does not otherwise discuss Hua's medical condition. [*Id.* at 10–12.]

On January 28, 2020, Hua met with Neuman to discuss her workload and her inability to complete overtime work. [Dkt. No. 38-6 at ¶¶ 32–33; Dkt. No. 39-1 at ¶ 4.] Hua told Neuman that she had "heart disease called HCM" that caused dizzy spells and chest pain. [Dkt. No. 38-6 at ¶ 34; Dkt. No. 32-3 at ¶ 20.]

The parties dispute whether Neuman already knew about Hua's medical condition at this point. Hua contends that her medical condition was the general knowledge of the management team, [Dkt. No. 38-6 at ¶ 35.], as evidenced by her two hospital visits in May and July of 2018. [*Id.*; Dkt. No. 39-1 at ¶¶ 1–2.] Neuman avers

5

that she knew that Hua had been taken to the hospital once but did not know why. [Dkt. No. 32-3 at ¶ 21.] Hua says that she "saw her supervisors or managers received copies of her FMLA certificate every time after she submitted FMLA paperwork." [Dkt. No. 38-6 at ¶¶ 35–36.] As a result, Neuman should have received a copy. [*Id.*] Hua testified that she did not remember whether Neuman had a copy of her FMLA documentation or if Neuman had read it. [*Id.* at ¶ 36.] Hua also alleges that a coworker sent Neuman an email stating that Hua had an allergic reaction at the office. [*Id.* at ¶ 35.] Neuman admits that on December 12, 2019, she was made aware that Hua had experienced an allergic reaction, but Neuman did not ask any further questions about Hua's medical condition. [Dkt. No. 32-3 at ¶ 22.]

After meeting with Neuman, Wright told Hua to "focus on the December variances, not older variances dated prior to December." [Dkt. No. 38-6 at ¶ 38.] Hua was not disciplined or complained about for not completing the assigned variances, denied any breaks or time off requested, or otherwise required to work overtime. [*Id.* at ¶ 39–41.]

On March 5, 2020, Hua emailed Neuman to request that she could work from home, stating:

> Dear Laura, [a]s you knew already, I have hypertrophic cardiomyopathy heart disease and I have very weak immunity. To ensure I stay healthy and amid the growing concerns over the coronavirus outbreak as below AJG updating our guidance. I feel I should work from home and have the ability to do so, could you please consider I can work from home?

[*Id.* at ¶¶ 37, 42.] On March 20, 2020, Gallagher required all its staff to work from home in light of the then-ongoing COVID-19 pandemic. [*Id.* at ¶ 44.] Hua contends

6

that in the fifteen days between her request and Gallagher's requirement that all employees work from home, Gallagher did not respond to her requested accommodation. [*Id.*]

In April of 2020, Neuman prepared Hua's 2019 performance evaluation, which concluded that Hua was meeting "some, but not all expectations." [*Id.* at ¶ 46; Dkt. No. 39-1 at ¶¶ 22, 46, 53.] Accounts Payable Specialists, like Hua, receive annual evaluations. [Dkt. No. 38-6 at ¶ 45.] Hua was rated as meeting "some, but not all expectations" in 2016 and 2017 and meeting "all" expectations in 2018. [*Id.* at ¶ 48.] For the 2019 evaluation, Neuman contends that she based Hua's evaluation on her own perceptions, Hua's 2016 and 2017 performance evaluations, and her conversations with other Accounts Payable senior managers. [*Id.* at ¶ 48.] While Hua contends that her performance evaluation was unfair, Hua testified that she was not aware of what information Neuman considered or who Neuman talked to in creating her 2019 performance evaluation. [*Id.* at ¶ 50.] Hua did not sign her 2019 performance evaluation. [*Id.* at ¶ 51.] Hua testified that she did not believe that the evaluation was "fair," nor did it accurately describe her performance. [*Id.*]

Hua alleges that she requested a one-on-one meeting with Neuman to discuss her performance evaluation, but Neuman failed to respond. [*Id.*] Hua contends that she asked three other employees whether they were able to schedule such meetings, who all confirmed they did. [*Id.* at ¶¶ 51–52.]

### D. Gallagher's June 2020 Reduction in Force

On June 15, 2020, Hua and two other Accounts Payable employees, Sandi Pigoni and Michael Gamez-Avila, were terminated as part of a reduction in force ("RIF"). [Dkt. No. 38-6 at ¶¶ 55, 65.][4]

Gallagher contends that the RIF was economically necessary. [*Id.* at ¶¶ 55–56.] Even before the COVID-19 pandemic, Gallagher says it had begun the process of evaluating departments for potential cuts. [*Id.* at ¶ 55.] Patrick Badger, who then served as the Director of the National Account Center for Gallagher, had decided that day-to-day transactional tasks performed by the Accounts Payable Department in the Rolling Meadows branch would be moved to Gallagher's Service Center in India. [*Id.*] As a result, Accounts Payable Specialists who performed this sort of work would be the best candidates for the RIF. [*Id.* at ¶ 58.] While Gallagher initially planned for this shift in late 2020 or 2021, due to the COVID-19 pandemic, Gallagher accelerated its plan, which "resulted in the need for position eliminations in the Accounts Payable Department in 2020." [*Id.* at ¶¶ 55–56.] Badger informed Hua at her termination meeting that Gallagher was facing "financial challenge[s]" due to the ongoing COVID-19 pandemic and, as a result, "need[ed] to reduce [] people." [*Id.* at ¶ 64.]

Gallagher contends that it selected Hua, Pigoni, and Gamez-Avila for the RIF because "they were not performing as well as others who were performing the day-to-day transactional work and that they had lower demonstrated capabilities and

---

[4] Hua concedes in her response brief that Gamez-Avila was laid off in June 2020. [Dkt. No. 38 at 4; Dkt. No. 38-6 at ¶ 26.]

skillsets than those who remained on the Accounts Payable team." [Dkt. No. 38-6 at ¶¶ 59–60.] While Gallagher concedes that Neuman knew that Hua had a medical condition, (Hua told Neuman about her "HCM" in January of 2020), Gallagher argues that Neuman did not know that Hua's condition constituted a disability because Neuman was unaware of any requests for accommodation as a result of Hua's HCM, that Neuman did not know that Pigoni had a disability, and Badger did not know if any of the three had a disability. [*Id.* at ¶¶ 61–62.]

Hua contends that Gallagher's stated reasons for the RIF were false. In support, she argues that Gallagher hired four new individuals into her department between October 2019 and June 2020, including Ms. Jamil Qureshi in October 2019, Mr. Michael Armstrong in October 2019, Ms. Raven Bell in February 2020, and Ms. Adrienne Wicklund in June 2020.[5] [*Id.* at ¶¶ 55–57.] Hua additionally avers that "Gallagher's CEO stated that the company was in very good financial shape during Gallagher's internal meetings, and that Gallagher was still hiring and was offering my positions [sic]." [Dkt. No. 38-6 at ¶ 56; Dkt. No. 38-5 at ¶ 40; Dkt. No. 39-1 at ¶ 25.] Finally, Hua claims that Pigoni, who was also impacted by the RIF, had a heart

---

[5]    Gallagher denies that any of these individuals were hired at the time that Hua alleges. [Dkt. No. 39-1 at ¶ 26.] Gallagher contends that (1) Qureshi was hired by Gallagher as a Senior AP Specialist on April 29, 2019 and was not in the Accounts Payable Department, (2) Michael Armstrong was not in the Accounts Payable Department and only performed a few one-off variance resolution tasks, (3) Raven Bell was hired on May 1, 2013 and was not part of the Accounts Payable Department, and (4) Adrienne Wicklund was hired on March 26, 2018 in the Accounts Receivable Department, moved to the Accounts Payable Department on June 1, 2020 as a Senior Accounts Payable Specialist, and completed more advanced analytical work as a result. [*Id.*]

condition and a heavier workload after the work re-distribution in 2019, and that Neuman and Badger knew both women were disabled. [Dkt. No. 38-6 at ¶¶ 55–62.]

## II.    Procedural Background

On July 8, 2020, Hua filed a Charge of Discrimination with the EEOC, alleging disability-based discrimination under the ADA. [Dkt. No. 38-6 at ¶ 69; Dkt. No. 1-2 at 1.] In her EEOC complaint, Hua alleged disability discrimination and checked the box titled "Disability." [Dkt. No. 1-2 at 1.] Hua did not check the box entitled "Retaliation" or any other box listed. [*Id.*] Hua alleged that the date of her termination was the date of discrimination, June 15, 2020. [*Id.*] The "particulars" read as follows:

> I began employment with [Gallagher] in or around June 2016. My most recent position was Account Payable Analyst. Respondent was aware of my disability. During my employment, I was subjected to different terms and conditions that similarly situated employees, including, but not limited to, increased work load. I was subsequently given a poor performance evaluation. I was discharged on or about June 15, 2020. I believe I have been discriminated against because of my disability, in violation of [the] Americans with Disabilities Act of 1990, as amended.

[*Id.*]   Hua alleges that she filed out the form as a *pro se* litigant with an EEOC representative on the phone. [Dkt. No. 38-6 at ¶¶ 69–71; Dkt. No. 39-1 at ¶ 31.] After the representative completed the form, the representative sent Hua the form, which she then signed and submitted. [Dkt. No. 38-6 at ¶¶ 69–71; Dkt. No. 39-1 at ¶ 31.] On November 23, 2020, Hua filed this lawsuit, alleging disability discrimination under a disparate treatment theory, disability retaliation, and failure to accommodate under the ADA. [Dkt. No. 38-6 at ¶ 75; Dkt. No. 1.]

## III.  Legal Standard

The Court should grant summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Skiba*, 884 F.3d at 717 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Id.* (quoting *Feliberty v. Kemper Corp.*, 98 F.3d 274, 276–77 (7th Cir. 1996)). In doing so, the Court may not weigh conflicting evidence or make credibility determinations. *See Johnson v. Advoc. Health & Hosp. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Further, the Court must give the nonmovant "the benefit of reasonable inferences from the evidence, but not speculative inferences in [her] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## IV.  Analysis

### A.  Disability Discrimination under the ADA

The Court first considers Hua's disability discrimination claim under the ADA. The ADA prohibits discrimination "on the basis of disability in regard to . . . [the]

11

discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 798 (7th Cir. 2018) ("The ADA prohibits employers from discriminating against qualified individuals due to a disability."). To prove a § 12112(a) violation, Hua must show that (1) she is "disabled" within the meaning of the statute, (2) "[she] is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation," (3) "[she] suffered an adverse employment action," and (4) "the adverse action was caused by [her] disability." *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020).

To show the fourth element, the parties are entitled to utilize the *McDonell Douglas* burden-shifting framework, or the standard employed in *Ortiz v. Werner Enterprises, Inc.* 834 F.3d 760 (7th Cir. 2016). *See Brooks v. Avancez*, 39 F.4th 424, 434–41 (7th Cir. 2022) (applying both the *Ortiz* standard and the *McDonell Douglas* burden-shifting framework to an ADA discrimination claim); *see also David v. Bd. of Tr. Of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("[B]oth before and after *Ortiz*, *McDonnell Douglas* is a means of organizing, presenting, and assessing [c]ircumstantial evidence . . . in discrimination cases."). Because the parties utilize both analyses in their briefs [Dkt. No. 38 at 6–11; Dkt. No. 39 at 7–15], the Court does the same. *See Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d 655, 665–66 (N.D. Ill. 2016) (alterations in original) (quoting *Ortiz*, 834 F.3d at 765) ("A district court must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether 'a

12

reasonable factfinder [could] conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'").

1.    *McDonnell Douglas* Burden-Shifting Framework

The Court begins its analysis of Hua's discrimination claim by considering the *McDonnell Douglas* framework. To establish a *prima facie* case under the *McDonnell Douglas* framework, Hua must show that: (1) she is disabled under the ADA, (2) her job performance met Gallagher's legitimate expectations, (3) she suffered an adverse employment action, and (4) other similarly situated individuals who were not disabled received more favorable treatment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Brooks*, 39 F.4th at 434. When a RIF takes place—like in the present case—but is alleged to have occurred in a discriminatory fashion, Hua's burden is to "show (in addition to the first two elements of the McDonnell Douglas claim) that she was discharged and that other, similarly situated employees who were not members of the plaintiff's protected class were treated more favorably." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000); *see also Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000) ("A RIF occurs when an employer permanently eliminates certain positions from its workforce.").

Gallagher does not dispute, for purposes of summary judgment, that Hua has met her initial *prima facie* burden. [Dkt. No. 32 at 4.] The burden, therefore, shifts to Gallagher to articulate a legitimate, non-discriminatory reason for including Hua in

the June 2020 RIF to rebut the presumption of discrimination, which Hua may then attack as pretext. *McDonnell Douglas*, 411 U.S. at 802; *Brooks*, 39 F.4th at 434.

a)   *Gallagher's Legitimate, Non-Discriminatory Reason*

Gallagher, having not challenged Hua's *prima facie* case, has the burden to articulate a legitimate, non-discriminatory reason for including Hua in the June 2020 RIF to rebut the presumption of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Brooks*, 39 F.4th at 434. The Court finds that Gallagher meets this burden.

An economic downturn in the defendant's industry is generally considered a legitimate, non-discriminatory reason for a RIF. *See, e.g.*, *Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1043–44 (7th Cir. 2000) (finding that an economic downturn in [the] defendant's industry was a legitimate, non-discriminatory reason for a RIF); *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 574 (7th Cir. 2003) (observing that a business's need to reduce costs was a legitimate, non-discriminatory reason for a RIF). Decisionmakers can consider performance when identifying candidates for a RIF, even if an employee's performance might not have been a reason for termination absent the RIF. *See Testerman v. EDS Tech. Prod. Corp.*, 98 F.3d 297, 303 (7th Cir. 1996) (observing that poor performance can make an employee "expendable" when a RIF takes place, even if the employee would not have been fired absent the RIF). Businesses can even target certain departments for reduction if the decision is reasonable given the business's stated economic need. *See Schuster*, 327 F.3d at 574 (noting that a targeted RIF at a particular department due to business need was "sensibl[e]").

14

Gallagher alleges that it needed to cut costs for business reasons, which was only expedited by the financial downturn associated with the COVID-19 pandemic in 2020. [Dkt. No. 38-6 at ¶¶ 55–56.] Gallagher further contends that it selected Hua to be terminated as part of the RIF because she focused on day-to-day transactional work, which could be outsourced. [*Id.* at ¶¶ 58–60.] On this showing, the Court can conclude that Gallagher has presented a legitimate, non-discriminatory reason for its RIF and Hua's inclusion in it. To the extent Hua argues that Gallagher did not have a legitimate, non-discriminatory reason for its RIF, these arguments are more appropriately considered in the Court's pretext analysis, and they are discussed below. *See Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 718 (7th Cir. 1999) (observing that, under the *McDonnell Douglas* burden-shifting framework, after the employer presents a legitimate, non-discriminatory reason for dismissal, the burden shifts to the employee to attack that reason as pretext, including stating that the employer did not honestly believe the stated reason for its dismissal); *see also Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1197 (7th Cir. 1997) (noting that the employee may show pretext by presenting evidence that that the employer targeted disabled employees for the RIF).

b) *Pretext*

Because Gallagher has articulated a legitimate, non-discriminatory reason for its June 2020 RIF and its selection of Hua, the burden of proof shifts back to Hua to show that the reason articulated is a pretext. *McDonnell Douglas*, 411 U.S. at 802; *Brooks*, 39 F.4th at 434. In determining pretext, "[t]he question is not whether the

15

employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action." *Grant v. Trs. Of Ind. Univ.*, 870 F.3d 562, 570 (7th Cir. 2017) (citation omitted). Hua can demonstrate that Gallagher did not honestly believe the reason it offered for her termination "by showing that [Gallagher's] reason for the adverse employment action (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to motivate the action." *Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013) (citing *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002)). To show pretext in a RIF case, Hua must establish that an improper motive "tipped the balance" in favor of her discharge. *Testerman*, 98 F.3d at 303–04 (quoting *Umpleby v. Potter & Brumfield, Inc.*, 69 F.3d 209, 213 (7th Cir. 1995)). In turn, Gallagher's justification need not be a "good reason," but merely a disability-neutral one. *Warren v. Solo Cup Co.*, 516 F.3d 627, 630 (7th Cir. 2008) (citations omitted).

Hua offers several arguments in favor of concluding that Gallagher's legitimate, non-discriminatory reason for Hua's termination was merely a pretext. Her arguments generally fall into five categories: (1) there "was no such RIF, or it was simply a cover up," as evidenced by continued hiring into the Accounts Payable Department and by comments from Gallagher's CEO; (2) Gallagher relied on false reasons when selecting which positions to eliminate because every Accounts Payable Specialist had the same amount of "day-to-day transactional work"; (3) Gallagher relied on inconsistent reasons for Hua's termination; (4) Gallagher knew about Hua and Pigoni's medical condition earlier than it now claims; and (5) even accepting

16

Gallagher's criteria for selection, there are genuine issues of material fact regarding Hua's work performance. [Dkt. No. 38 at 8–11.] Each argument is addressed below.

_Gallagher's Financial Condition and the RIF_: Hua first argues that Gallagher's RIF was "simply a cover up for Gallagher replacing the old and disabled Accounts Payable team members, such as Ms. Hua and Ms. Pigoni, with young and healthy new staff." [Dkt. No. 38 at 8-9.] In support, Hua points to two pieces of evidence: first, that Gallagher allegedly hired four new individuals to the Accounts Payable team between October 2019 and June 2020; and second, a statement made by Gallagher's CEO that "the company was in very good financial shape" and "was still hiring." [Dkt. No. 38 at 8–9.]

Evidence that "an employer continued hiring during a purported RIF may suggest that the RIF was pretextual." _See Paluck v. Gooding Rubber Co._, 221 F.3d 1003, 1012–13 (7th Cir. 2000) (noting that a RIF that disproportionately affects workers of a protected class may indicate that the RIF "was an excuse to get rid of workers belonging to a protected group"). Here, however, Hua's argument that Gallagher hired four new employees during the period she has identified is simply unsupported by the record. Hua relies on her Exhibit A entitled "Variance Summary," to suggest that four new individuals were hired during the relevant timeframe. [Dkt. No. 38 at 9; Dkt. No. 38-5 at ¶ 42.] Hua created this exhibit using Gallagher's "monthly CP Variance reports," which she says, "indicated the amount of the problems need [_sic_] to be resolved by each team member." [Dkt. No. 38-5 at ¶¶ 12, 41.] Hua argues that the Exhibit A establishes that Gallagher added four people to

the team during the time period spanning October 2019 to June 2020: Jamil Qureshi, Michael Armstrong, Raven Bell, and Adrienne Wicklund. [Dkt. No. 38 at 9.]

Hua's reliance on this document is unpersuasive. The "monthly CP Variance reports" Hua used to create Exhibit A do not include hiring or firing data, or even more general employee-related hiring information, like salary data or full- or part-time status. *See generally* [Dkt. No. 32; Dkt. No. 38; Dkt. No. 39.] Nor does Hua allege that she was privy to hiring and firing decisions as a part of her work as an Accounts Payable Specialist. *See generally* [Dkt. No. 38-5.] Rather, Exhibit A purports to show each employee's assigned variances from August 2019 with June 2020, with a calculated monthly average. [Dkt. No. 38-1 at 2.] The Seventh Circuit has rejected the use of this type of incomplete or unexplained evidence as a basis for establishing that an employer's continued hiring renders a RIF pretextual. *See Paluck*, 221 F.3d at 1014 (noting that the Court could not conclude from a single document purportedly listing "hirings and terminations in 1997" that the company "continued hiring new employees in the midst of its purported RIF" without any information regarding their purported hiring, like whether the employees were full- or part-time, their salaries, or any of their duties).

Indeed, here, the record appears to establish that *none* of the four employees Hua identifies were hired during the time period Hua identifies. Qureshi was hired in April of 2019 [Dkt. No. 39 at 8–9], and Bell was hired in May of 2013, both of which pre-date Exhibit A's timeline of August 2019 to June 2020. Bell and Armstrong did not work in the Accounts Payable Department. [*Id.*] The only employee who was

moved into the Accounts Payable Department between August 2019 to June 2020 was Wicklund, but she was transferred there from another department into a *Senior* Accounts Payable Specialist Role. [*Id.* at 9.] As Gallagher points out—and Hua does not dispute—only Accounts Payable Specialists were considered for the RIF. [Dkt. No. 39 at 9; Dkt. No. 32-4 at ¶¶ 8–10 (Badger averring that Gallagher intended to transfer day-to-day transactional work to its India Service Center, which was completed by Accounts Payable Specialists).] As such, continued hiring as evidence of a pretext falls flat.

Hua also points to statements by Gallagher's CEO as probative of the pretext issue, but this argument is unpersuasive for several reasons. While workplace remarks related to an adverse employment action can be probative of discrimination, "[t]he less direct the connection between the comment and the employment action— that is, if the comment was not made in temporal proximity to the employment action, or if the comment was not made in reference to that action—the less evidentiary value the comment will have." *Schuster*, 327 F.3d at 575–76. Here, Hua relies exclusively only on her affidavit, which states "Gallagher's CEO stated that the company was in very good financial shape during Gallagher's internal meetings, and that Gallagher was still hiring and was offering my positions [sic]." [Dkt. No. 38-5 at ¶ 40.] But Hua provides no information about when this statement was made or in what context. Without that, the statement has little, if any, probative value.

In addition, the pretext inquiry asks whether *decisionmakers* made false or inconsistent statements about the June 2020 RIF. *See Krchnavy v. Limagrain*

19

*Genetics Corp.*, 294 F.3d 871, 876–77 (7th Cir. 2002) ("An inference of pretext may be permissible only when *decisionmakers* make false or inconsistent statements about the circumstances of a particular employment decision." (emphasis in original)); *see also Jardien v. Winston Network, Inc.,* 888 F.2d 1151, 1154 (7th Cir. 1989) (holding that "actions and comments by employees not involved in a discharge decision cannot provide a basis for charging other employees with discrimination"). Hua does not dispute that Badger and Neuman made the decision to terminate her, not Gallagher's CEO. [Dkt. No. 38-6 at ¶ 57.] As such, the comments do not support a pretext inference.

*Gallagher Reasons for Selecting Which Positions to Eliminate*: Next, Hua argues that Gallagher relied on false reasons when selecting which positions to eliminate. [Dkt. No. 38 at 9.] According to Hua, Gallagher's stated reason to terminate only those team members focusing on day-to-day transactional work was pretextual because every Accounts Payable Specialist had the same workload. [*Id.*] Hua bases this conclusion "on [her] observations and experiences working on the Accounts Payable team, CP variance was about 50-70% of the total full workload for each specialist, the rest of which were day-to-day transactional work and special projects occasionally assigned by the managers." [*Id.*, Dkt. No. 38-5 at ¶ 7.]

While the nonmovant can successfully dispute a material fact based on their own affidavit, the Court is not forced to accept all the nonmovant's contentions wholesale. *See Hill v. Tangherlini*, 724 F.3d 965, 967–68 (7th Cir. 2013) (observing that affidavits can still be "perfectly admissible evidence through which a party tries

to present its side of the story at summary judgment"). A nonmovant's "inferences and opinions must be grounded in observation or other first-hand personal experience" and may not be "flights of fancy, speculation, hunches, intuitions, or rumors about matters remote from that experience." *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).

Hua does not state the basis for her knowledge of all the workloads of every Accounts Payable Specialist in her department or provide any documentary evidence for this assertion. *See Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020) (holding that the nonmovant "may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; [she] must go beyond the pleadings and support [her] contentions with proper documentary evidence"). As such, Hua's opinion on the workload of other Accounts Payable Specialists is speculation and thus insufficient to create a genuine issue of fact or uphold her pretext burden. *See Sportfuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 601 (7th Cir. 2019) (quoting *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact.").

*Inconsistent Reasons for Termination*: Next, Hua argues that Gallagher provided different reasons for her termination in June of 2020 than those offered in support of its summary judgment motion, thereby establishing pretext. [Dkt. No. 38 at 7–8.] "Even if [a RIF] was otherwise bona fide, a plaintiff may show pretext by demonstrating that the specific reasons given for including her in the reduction were pretextual." *Paluck*, 221 F.3d at 1012–13. "Shifting and inconsistent explanations can

provide a basis for a finding of pretext. But the explanations must actually be shifting and inconsistent to permit an inference of mendacity." *Schuster*, 327 F.3d at 577.

The parties do not dispute that on June 15, 2020, at Hua's termination meeting, Hua "was told that she was laid off only because Gallagher was having financial challenges and had to reduce headcount." [Dkt. No. 38-7 at ¶ 5.] Gallagher's briefs state much the same, *i.e.*, with the onset of the COVID-19 pandemic, Gallagher "suffered significant economic impacts . . . which required it to develop, accelerate and enact cost containment strategies," which included layoffs. [Dkt. No. 32 at 4–5; Dkt. No. 39 at 12.]

Hua contends, however, that she was initially told that her selection for the RIF was *not* motivated by her performance, but that Badger now "blame[s] her performance." [Dkt. No. 38 at 10.] Hua cites only to her own affidavit in support of this position, [Dkt. No. 38-5 at ¶¶ 37-39], leaving the Court to wonder which portion of Badger's affidavit is inconsistent with the explanation Hua was given at the time of her termination. Badger's affidavit reads, in part:

> As we were deciding who would be impacted by the RIF, we considered the Accounts Payable team members who focused almost exclusively on the day-to-day transactional work. We then looked at the capabilities and skills of each such team member. We chose to eliminate individuals who had lower demonstrated capabilities and skillsets than others on the Accounts Payable team, which limited their ability to be involved in more complex work that would not be moved overseas.

[Dkt. No. 32-4 at ¶ 9.] Assuming this is what Hua is referring to, the Court does not see any inconsistency with Gallagher's stated rationale for the RIF. Nor does Hua make any attempt to illuminate how this amounts to a shifting explanation.

Hua's argument, to the extent she even develops one, is similar to the facts in *Schuster*. There, the plaintiff argued that his former employer had shifted its explanation for his selection in the RIF—thereby raising the specter of pretext—when it initially stated that it relied on "talent profiles" to select employees for the RIF, only later to rely on specific employees' work performance in its summary judgment motion. 327 F.3d at 578. The Seventh Circuit rejected this argument and found that "[t]he alleged last-minute switch from relying on Schuster's scores on his talent profile to relying on specific work-performance deficiencies as a rationale for his termination is an additional, not necessarily inconsistent reason for the employment decision, rather than an abrupt change in explanation." *Id.* at 579.

Here, Gallagher has consistently maintained that it was suffering economically and resultingly needed to reduce headcount. [Dkt. No. 32 at 4–5; Dkt. No. 38-6 at ¶ 64; Dkt. No. 39-1 at ¶ 24.] Its briefs and materials offered in support of summary judgment merely explains *how* it reduced headcount. Nothing about the affidavit is "inconsistent" or amounts to "an abrupt change in explanation." *Schuster*, 327 F.3d at 579. Rather, the affidavit states that Hua's termination was predicated on the need to reduce headcount, and it adds context to Gallagher's focus on the Accounts Payable team: eliminating workers with responsibility for day-to-day transactional work that required lower capabilities and skillsets who could not take on more complex work that would not be moved overseas. [Dkt. No. 32-4 at ¶¶ 5-10.]

As Gallagher notes, "the decision was not made terminate Plaintiff's employment *because of* her performance – if a RIF had never become necessary for

cost containment, Plaintiff's employment would not have ended at that time." [Dkt. No. 39 at 12.] This simply is not pretextual under Seventh Circuit caselaw. *See Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006) ("In a RIF, it is not pretextual to terminate an individual perceived to be a weak performer in an organization even if that individual's performance could also be characterized as satisfactory or adequate.").

*Gallagher's Knowledge of Hua's Medical Condition*: Next, Hua contends that Badger and Neuman knew of her medical condition as early as May of 2018, so both must have considered it when Hua was assigned additional variance work in December of 2019. [Dkt. No. 38 at 9–10.] This additional work, Hua says, resulted in a poor performance review and ultimately, her selection for the RIF. [*Id.*]

Based on the record evidence, Neuman knew about Hua's medical condition on January 28, 2020, when Hua told her she was diagnosed with a "heart disease called HCM." [Dkt. No. 38-58 at ¶ 29; Dkt. No. 38-6 at ¶ 34.] Badger knew about Hua's condition on March 5, 2020, when Hua requested permission to work from home. [Dkt. No. 38-4 at 6.] Thus, Neuman and Badger knew about Hua's condition only *after* she was assigned additional variances in December of 2019. Her argument that knowledge of her medical condition led to a poor performance review and then to the RIF, fails. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) ("an employee cannot hold an employer liable under the ADA if the employer has no knowledge of the employee's disability"); *see also Hedberg v. Ind. Bell Tel. Co., Inc.*,

24

47 F.3d 928, 932 (7th Cir. 1995) ("If it does not know of the disability, the employer is firing the employee 'because of' some other reason.").

Hua also maintains that Badger, Neuman and Gallagher collectively "should have known about Ms. Hua's disability" due to Hua "heart attack episode at work, FMLA certificate, [and] multiple request[s] for accommodation between May 2018 and March 2020." [*Id.*] But Hua provides no connection between any FMLA certificate or her email to Thomas or Morgan requesting accommodations following her hospitalizations in 2018, and the decision to include her in the RIF in June 2020. *See generally* [Dkt. No. 38.] Her argument amounts to speculation.

The Court does not read Hua's brief to suggest that Hua's notice of her HCM condition to Neuman in January 2020 alone resulted in Hua's selection for the RIF. [Dkt. No. 38 at 9–10.] As Gallagher argues, Hua was one of three individuals included in the RIF, and there is no basis for concluding that either Neuman or Badger knew of any disability or request for accommodation by either of the other two employees impacted by the RIF, Ms. Pigoni or Mr. Gamez-Avila. [Dkt. No. 38-6 at ¶ 62].

Hua's attempts to rely on Pigoni as a "similarly situated Accounts Payment team member," who also suffered from a serious medical condition, are unpersuasive. [Dkt. No. 38 at 11.] While it is true that Pigoni was assigned additional variance work in December of 2019, and she was terminated in the RIF, Hua has not provided any record evidence to support her claim that Badger or Neuman knew about Pigoni's medical condition in June 2020. She only surmises that Badger and Neuman must have known that Pigoni had a serious heart condition because Pigoni had a "heart

attack one day after work" and because Hua learned that she and Pigoni took the same heart disease medication. [Dkt. No. 38-5 at ¶¶ 46–47, 49; Dkt. No. 38-6 at ¶ 62.] But Hua's personal knowledge of Pigoni's medical circumstances, whether it be Pigoni's heart attack or her medication, does not impute knowledge to Gallagher generally or to Badger or Neuman specifically. *See Beardsall*, 953 F.3d at 972. This falls far short of establishing that the RIF was a pretext to eliminate workers with medical conditions.

As importantly, it is undisputed that Gamez-Avila, who was not disabled, was also subject to the RIF. Hua makes no attempt to address this fact in her brief. The Court, therefore, concludes that Hua's claim that Gallagher only targeted disabled employees for the RIF, fails. *See also Schuster*, 327 F.3d at 577 (noting that a plaintiff's argument that only older workers were targeted for a RIF was not "persuasive" given that two younger employees were included in the RIF); *see also Paluck*, 221 F.3d at 1014 (holding that "statistical evidence" concerning whether "the RIF disproportionately affected employees protected by the ADEA" was insufficient alone for pretext purposes).

*Hua's Work Performance*: Finally, Hua suggests that even if Gallagher used "some of the [set] criteria" in implementing the RIF, "there are material disputes regarding Ms. Hua's performance and capability."[6] [Dkt. No. 38 at 10–11.] Hua

---

[6]     Hua contends that "overlaying all of this evidence" is the "negative or silent treatment from . . . management" which ignored or disregarded Hua's request for "conversation, review, or accommodations." [Dkt. No. 38 at 11.] Hua's argument amounts to a single sentence and as such, is an underdeveloped argument that the Court need not entertain. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

contends that she "demonstrated extensive working experience and broad work-related skillsets, grown better and better every year in her role on the Accounts Payable team, and that her 2018 Performance Review was rated 'expectations fully met.'" [*Id.* at 10.]

Hua's self-evaluation of her own performance is not dispositive and, more importantly, does not create a genuine issue of material fact. *See Hill*, 724 F.3d at 968 (affirming summary judgment for employer when former employee "disagreed" with his employer's "assessment" of him, rather than proving that the employer affirmatively lied about its reasons for firing him); *see also Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996) ("[A] plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions.").

While Hua disagrees with her 2019 performance evaluation for a host of reasons [Dkt. No. 38 at 10–11], her disagreement is immaterial to pretext inquiry, namely whether Gallagher honestly believed its reasons for selecting Hua. *See Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir.1997) ("[T]he question is not whether the employer's performance ratings were *right* but whether the employer's description of its reasons is *honest*." (emphasis in original)). Hua's explanations for her performance evaluation do not amount to evidence that Gallagher lied. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 590 (7th Cir. 2020) (observing that a plaintiff does not sufficiently demonstrate pretext when an employer is "wrong about its employee's performance, or [is] too hard on its employee," but when the employer's proffered

reason is "a lie."). Given that Hua presents no evidence that Gallagher did not honestly believe the reasoning of Hua's 2019 performance evaluation, the Court cannot conclude that her 2019 performance evaluation was pretextual. As such, Hua fails to meet her burden to demonstrate pretext sufficient to survive summary judgment.

### 2. Cumulative Assessment of the Evidence under *Ortiz*

Hua's claims fair no better under the *Ortiz* standard: whether a reasonable factfinder could conclude that Hua's disability caused her termination. *Zegarra*, 218 F. Supp. 3d at 665–66. Hua raises the exact same set of arguments in her *Ortiz* analysis as she does in the context of the *McDonell Douglas* burden-shifting framework, urging the Court to conclude that reasonable juror could infer that Hua (and Pigoni) were targeted because of their medical conditions. [Dkt. No. 38 at 6–8.] Considering the evidence as a whole, and for all the reasons discussed above, the Court concludes that no reasonable factfinder could conclude that Hua's disability caused her termination. Under either analysis, the Court grants Gallagher's motion for summary judgment on Hua's discrimination claim.

### B. Disability Retaliation and Failure to Accommodate under the ADA

The Court next considers Hua's disability retaliation and failure to accommodate claims under the ADA. Gallagher argues that Hua failed to administratively exhaust these claims, as Hua's EEOC complaint only raised whether Hua suffered disability discrimination. [Dkt. No. 32 at 8–11; Dkt. No. 39 at

28

1–3.] Gallagher further contends that even if Hua has administratively exhausted her claims, they still fail on substantive grounds. [Dkt. No. 32 at 11–14.]

Much like a discrimination claim under the ADA, to make out a retaliation or failure to accommodate claim, Hua must exhaust her administrative remedies, including filing an EEOC charge with those claims. *See Riley v. City of Kokomo*, 909 F.3d 182, 189 (7th Cir. 2018). However, if a claim is (1) "reasonably related to one of the EEOC charges," and (2) "can be expected to develop from an investigation into the charges actually raised," Hua's retaliation and failure to accommodate claims will be considered sufficiently exhausted. *Id.* (quoting *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 898 (7th Cir. 1999)). To satisfy the first prong, the "claims must at least describe the same conduct and implicate the same individuals." *See McHale v. McDonough*, 41 F.4th 866, 870 (7th Cir. 2022). The second prong requires the Court to speculate "as to what the EEOC might or might not discover in the course of an investigation" based on the EEOC complaint and other written allegations from the administrative proceedings. *Id.* (quoting *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)).

Under this standard, the Court concludes that Hua has established that her retaliation and failure to accommodate claims are sufficiently related to her disability discrimination claim. The claims concern the same conduct—Gallagher's assignment of a heavy workload despite Hua's medical condition and the failure to accommodate her March 2020 work from home request—and the same managers—Neuman and Badger. [Dkt. No. 38 at 12]. Given the particulars described in the EEOC complaint,

which directly raised her workload increase, it is likely that the agency would have discovered information about Hua's meeting with Neuman, and Hua's request for a work-from-home accommodation arising from her condition. [Dkt. No. 1-2 at 1.]

Although the Court concludes that she has administratively exhausted her retaliation and failure to accommodate claims, Hua's brief argues that her administrative exhaustion requirement should be excused and nothing more. She fails to respond in any way to the substance of Gallagher's arguments in favor of summary judgment on the merits. *See generally* [Dkt. No. 38.]. As such, she has waived any argument on these claims. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived").

Lastly, Hua's retaliation claim on the merits would still fail because she is unable to demonstrate pretext, as discussed above. *See Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601–02 (7th Cir. 2011) (requiring a showing of pretext for ADA retaliation claims). And Hua's failure to accommodate claim similarly flounders given that Hua filed her EEOC complaint on July 8, 2020, raising only her March 5, 2020 request to work from home. [Dkt. No. 1-2 at 1.] There is no evidence establishing that Gallagher failed to reasonably accommodate Hua's disability. *See Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015). Indeed, Gallagher granted Hua's request later that same month. [Dkt. No. 38-6 at ¶ 44.]). Accordingly, the Court grants Gallagher's motion for summary judgment on Hua's retaliation and failure to accommodate claim under the ADA.

## V.     Conclusion

For the reasons stated above, the Court grants Gallagher's motion for summary judgment. [Dkt. No. 31.] A final judgment consistent with Federal Rule of Civil Procedure 58 will enter in favor of Gallagher and against Hua. Civil case terminated.

Enter: 20-cv-6921

Date:  June 1, 2023

_____
Lindsay C. Jenkins
United States District Judge